# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| STEVEN HOFFMANN and<br>SARA HOFFMANN,<br><br>   Plaintiffs,<br><br>  v.<br><br>EMPIRE MACHINERY & TOOLS LTD.,<br><br>   Defendant,<br>   Third-Party Plaintiff<br><br>  v.<br><br>INDUSTRIAS ZUMARRAGA S.A..,<br><br>   Third-Party Defendant. | Case No. 4:10-CV-00832-NKL |

## ORDER

Before the Court are the Motion to Dismiss for Lack of Personal Jurisdiction [Doc. # 18] filed by Third-Party Defendant Industrias Zumarrága, S.A. ("Zumarrága") and the Motion for Leave to File First Amended Complaint [Doc. # 36] filed by Plaintiffs Steven and Sara Hoffmann. For the following reasons, the Court grants the Plaintiffs' unopposed motion and denies the Motion to Dismiss.

**I. Background**

This lawsuit arises out of a hand injury that Plaintiff Steven Hoffmann suffered while using an allegedly defective beader machine at his place of employment in Missouri. That

beader machine was manufactured by Zumarrága, a Spanish entity, and sold to Plaintiff's employer by Empire Machinery and Tools, Ltd. ("Empire"), a Canadian entity.

Mr. Hoffman and his wife, Sara Hoffmann, brought suit against Empire in the Jackson County Circuit Court. Empire asserted a third-party claim against Zumarrága for indemnification and contribution and removed the action to this Court based on diversity jurisdiction. Zumarrága then moved to dismiss Empire's Third-Party Petition for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure. Subsequently, the Hoffmann Plaintiffs moved for leave to file their First Amended Complaint, asserting claims against Zumarrága as well as Empire.

Through the affidavit of its accountant, Maria Aranzazu Lizundia Iriondo, Zumarrága asserts that it has never conducted any business in the United States, including the State of Missouri. Lizundia Iriondo further states that Zumarrága has never advertised in Missouri or the United States and that Zumarrága made no telephone calls, sent no correspondence, and made no personal visits to Missouri or the United States.

According to the affidavit of Empire's President, Laura Johnson, in 1992 Zumarrága and Empire's predecessor (Empire Machinery & Tools, a division of Empire Sheet Metal Mfg. Co. Ltd.) agreed that the predecessor entity would serve as the sole distributor of Zumarrága's products throughout North America, including the entire U.S. market. In 1999, Empire purchased its predecessor and continued as Zumarrága's North American distributor until 2009.

Pursuant to its agreement to distribute Zumarrága's products throughout North

America, Empire placed advertisements featuring Zumarrága's beader machine in *Snips Magazine*, a trade publication for the sheet metal industry distributed throughout the U.S. [Doc. # 25, Ex. B.] Empire also attended a number of trade shows throughout the U.S. at which Empire promoted Zumarrága's products. Finally, Empire leveraged its network of 35 industrial machinery dealers located in 21 states to sell Zumarrága's products.

In her affidavit, Johnson explains that from 1992 to 2009, Empire and its predecessor sold between 800 - 1,000 of the beader machines at issue in this case, the CMZ-7R. Empire's records for the period between 1997 and 2009 indicate that it distributed 714 machines manufactured by Zumarrága throughout North America, of which 564 were distributed to purchasers located in the U.S. In other words, 79% of Empire's sales of Zumarrága's machines were directed to the U.S. during the period of record.

Johnson further states that Zumarrága distributed its products to Empire ready for use by the intended end-user. Zumarrága's name and logo remained on its products sold by Empire. To account for differences in the North American and European electrical grids, Zumarrága installed a different electric motor in the machines to be used in North America. Zumarrága also assisted Empire in developing technical literature – e.g., manuals and parts diagrams – to accompany Zumarrága's products distributed in North America.

## II. Discussion

### A. Motion for Leave to File First Amended Complaint

Plaintiffs Steven and Sara Hoffmann seek leave to file their First Amended Complaint pursuant to Rule 14(a)(3). "The plaintiff may assert any claim against the third-party

3

defendant arising out of the same transaction or occurrence that is the subject-matter of the plaintiff's claim against the third-party plaintiff." Fed. R. Civ. P. 14(a)(3). Plaintiffs note that Rule 14(a)(3) does not require them to seek a stipulation of the parties or leave of Court to file direct claims against third-party defendants. *Cf.* Fed. R. Civ. P. 14(a)(1). Plaintiffs also state that their First Amended Complaint causes no undue prejudice to Zumarrága.

As Zumarrága failed to respond to this motion, the Court assumes that Zumarrága has not been unduly prejudiced. Pursuant to Rule 14(a)(3), the Court grants Plaintiffs' unopposed motion.

The First Amended Complaint contains four counts, each asserted against both Empire and Zumarrága: (1) strict liability product defect; (2) strict liability failure to warn; (3) negligence; and (4) loss of consortium. [Doc. # 36, Ex. 1.]

### B. Motion to Dismiss

Rule 12(b)(2) provides that a party may move to dismiss based on lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). To defeat a motion to dismiss for lack of personal jurisdiction, the plaintiff must make a prima facie showing of jurisdiction. *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991) (citations omitted). This prima facie showing can be made through the use of affidavits, exhibits, or other evidence. *See Anheuser-Busch, Inc. v. City Merch.*, 176 F. Supp. 2d 951, 956 (E.D. Mo. 2001) (citing *Dakota Indus.*, 946 F.2d at 1389).

#### 1. Missouri's Long-Arm Statute

Missouri's long arm statute provides, in relevant part:

4

> Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits such person, firm, or corporation, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of such acts:
> . . .
> (3) The commission of a tortious act within this state; . . . .

Mo. Rev. Stat. § 506.500.

The Missouri Supreme Court has stated that by enacting the long-arm statute, the Missouri legislature had the "ultimate objective . . . to extend the jurisdiction of the courts of this state over nonresident defendants to that extent permissible under the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States." *State of Missouri ex rel. Deere and Co. v. Pinnell*, 454 S.W.2d 889, 892 (Mo. 1970) (en banc). "Accordingly, Missouri courts have interpreted the statute broadly to cover those cases where the Due Process Clause permits the assertion of personal jurisdiction." *Clune v. Alimak AB*, 233 F.3d 538, 541 (8th Cir. 2000) (citation omitted). Therefore, the critical question here is whether the exercise of personal jurisdiction would comport with due process. *Id.*

### 2. Due Process

In the context of personal jurisdiction, due process requires that (1) the defendant has certain minimum contacts with the forum state, and (2) the maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The Supreme Court has held that there is no talismanic formula to determine personal jurisdiction. *Clune*, 233 F.3d at 542 (citing *Burger King Corp. v.*

5

*Rudzewicz*, 471 U.S. 462, 485 (1985)). The baseline for minimum contacts is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King*, 471 U.S. at 475 (citation omitted). The Eighth Circuit has further explained:

> In certain unusual cases, the minimum requirements inherent in the concept of fair play and substantial justice may defeat the reasonableness of jurisdiction even though the defendant has purposefully engaged in forum activities. The Supreme Court [in *Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano County*, 480 U.S. 102 (1987)] held that in addition to determining whether a defendant has purposefully established minimum contacts with the forum state, courts must also examine the burden on the defendant, the interests of the forum state in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies.

*Falkirk Mining Co. v. Japan Steel Works, Ltd.*, 906 F.2d 369, 374 (8th Cir. 1990) (internal quotations and citations omitted).

### a. Minimum Contacts

The defendant's contact with the forum state must be such that it should reasonably anticipate being haled into court there. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

> Jurisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State. . . . So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Burger King*, 471 U.S. at 476.

In *World-Wide Volkswagen*, the Supreme Court "rejected the assertion that a

*consumer's* unilateral act of bringing the defendant's product into the forum State was a sufficient constitutional basis for personal jurisdiction over the defendant." *Asahi*, 480 U.S. at 109 (citing *World-Wide Volkswagen*, 444 U.S. at 295-96). Yet Justice White had also written for the *World-Wide Volskwagen* majority:

> [I]f the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.

444 U.S. at 297. Thus, personal jurisdiction comports with due process when exercised "over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* at 297-98.

In *Asahi*, the Supreme Court again elucidated the stream of commerce theory, this time in the context of a mere component parts manufacturer. As the Eighth Circuit has summarized:

> The plaintiff in *Asahi* eventually settled his suit, but the action for indemnity between the Taiwanese company that sold the final product into California and the Japanese company that manufactured the allegedly defective component part remained to be litigated. The Supreme Court eventually held that the exercise of personal jurisdiction over the component manufacturer in a California state court did not comport with due process because it was unreasonable to subject the Japanese company to suit in California when neither the plaintiff nor the forum state had any significant interest in the outcome and when it would place a severe burden on the Japanese company.

*Barone v. Rich Bros. Interstate Display Fireworks, Co.*, 25 F.3d 610, 614 (8th Cir. 1994) (citing *Asahi*, 480 U.S. at 107). Though the *Asahi* Court was badly splintered, the Eighth

Circuit noted that "five justices agreed that continuous placement of a significant number of products into the stream of commerce with knowledge that the product would be distributed into the forum state represents sufficient minimum contacts to satisfy due process." *Id.* "Although a majority of the *Asahi* Court agreed with Justice O'Connor that jurisdiction was not proper in that case, five Justices refused to adopt her articulation of a stream of commerce 'plus' theory," *Clune*, 233 F.3d at 542 – i.e., that the placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. *Asahi*, 480 U.S. at 112. For example, in his *Asahi* concurrence– joined by Justices White, Marshall, and Blackmun – Justice Brennan wrote that the stream of commerce theory "refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacturer to distributor to retail sale." *Id.* at 117 (Brennan, J., concurring).

In *Barone*, the Eighth Circuit found that there was personal jurisdiction over a foreign manufacturer pursuant to the stream of commerce theory where the foreign manufacturer "poured its products into regional distributors" and reaped the benefits of that distribution network. 25 F.3d at 615. Although Empire, as a Canadian entity, might not be considered a "regional distributor" in the traditional sense, in the twenty-first-century global economy, a sole North American distributor for a final product manufactured in Spain is just that. In 1994, the Eighth Circuit reasoned in *Barone*:

> Although a generation has not quite passed since *World-Wide Volkswagen* was decided, the acceleration in the internationalization of commerce is apparent. In this age of NAFTA and GATT, one can expect further globalization of

> commerce, and it is only reasonable for companies that distribute allegedly defective products through regional distributors in this country to anticipate being haled into court by plaintiffs in their home states.

*Id.* As *Clune* noted six years later, "[i]f we were to conclude that despite its distribution system, [the foreign manufacturer] did not intend its products to flow into Missouri, we would be bound to the conclusion that the company did not intend its products to flow into any of the United States." 233 F.3d at 544. Ultimately, the inquiry is not where the regional distributor is located, but whether the manufacturer continuously placed a significant number of products into the stream of commerce with knowledge that the product would be distributed into the forum state. *Barone*, 25 F.3d at 614. Moreover, if the Court were to accept Zumarrága's argument, a foreign manufacturer could insulate itself from liability in each of the fifty states simply by using a Canadian or Mexican distributor to market its products to the U.S. *See Tobin v. Astra Pharm. Prods., Inc.*, 993 F.2d 528, 543 (6th Cir. 1993).

Here, there is evidence indicating the following: Empire sells 79% of the beader machines it receives from Zumarrága in the United States. Pursuant to its agreement to distribute Zumarrága's products throughout the U.S., Empire placed advertisements featuring Zumarrága's beader machine in *Snips Magazine*, a trade publication for the sheet metal industry distributed throughout the U.S. Empire leveraged its network of 35 industrial machinery dealers located in 21 states to sell Zumarrága's products. Empire attended a number of trade shows throughout the U.S. at which Empire promoted Zumarrága's products. Zumarrága distributed its products to Empire ready for use by the intended end-user.

Zumarrága's name and logo remained on its products sold by Empire. To comply with North American standards, Zumarrága installed a different electric motor in the machines to be used in Canada and the U.S. Zumarrága also assisted Empire in developing technical literature – e.g., manuals and parts diagrams – to accompany Zumarrága's products distributed in North America.

Contrary to Zumarrága's assertions, the Court sees no reason why Zumarrága must have single-handedly created and exercised sole control over the entire chain of distribution in order to purposefully avail itself of the U.S. market for beader machines, including Missouri. The Court also finds distinguishable *Gould v. Krakatau Steel*, 957 F.2d 573 (8th Cir. 1992), relied upon heavily by Zumarrága. In *Gould*, there was no evidence that the relationship between the U.S. distributor and the Indonesian steel manufacturer extended beyond the single transaction at issue. *Id.* at 574, 576. There, the Eighth Circuit disagreed with the plaintiff's argument that the Indonesian company could have foreseen that its products would enter the state of Arkansas by virtue of its sales to the distributor, ultimately finding that there were insufficient contacts to support personal jurisdiction. *Id.* at 576 (citing *World-Wide Volkswagen*, 444 U.S. at 297). *World-Wide Volkswagen* had reasoned that "the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State," as when an end user drives the product across the United States. 444 U.S. at 297. However, "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be

purchased by consumers in the forum State." *Id.* at 297-98.

Unlike in *Gould*, here the relationship between the distributor and the manufacturer extended beyond the single transaction at issue. *See Clune*, 233 F.3d at 545 ("*Gould* involved a limited transaction . . . . [which] sharply contrasts with the record in the present case which contains evidence of continuous transactions between [the foreign manufacturer] and its United States distributor."). Indeed, Empire and its predecessor entity are alleged to have served as the sole distributor of Zumarrága's products throughout North America, including the entire U.S. market. From 1997 to 2009, 79% of Empire's sales of Zumarrága's machines were directed to the U.S. Thus, the non-movants have at least established a prima facie case that Zumarrága worked with Empire to create a distribution system by which its beader machines regularly flowed into the entire U.S. market, including Missouri.

Finally, it is clear that the cause of action arises from the minimum contacts described above. The claims asserted against Zumarrága by Empire and the Hoffmanns arise from the efforts of the manufacturer to indirectly access the market for its product in the United States – including Missouri – and it is not unreasonable to subject it to suit in Missouri where its allegedly defective beader machine was there the source of injury. *See World-Wide Volskwagen*, 444 U.S. at 297.

### b. Fair Play and Substantial Justice

To determine whether the assertion of personal jurisdiction would be unfair, the Court must also examine: (1) the burden on Zumarrága; (2) the interest of Missouri in adjudicating the dispute; (3) the Plaintiffs' interest in obtaining convenient and effective relief; (4) the

judicial system's interest in obtaining the most efficient resolution of this matter; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *See Falkirk Mining Co.*, 906 F.2d at 374; *Clune*, 233 F.3d at 545.

First, with respect to the convenience of the parties, just as the Eighth Circuit noted in *Clune*:

> The overwhelming majority of the evidence in this case will be found in Missouri or the surrounding area . . . . As a result, [Swedish manufacturer] Industrivarden would have to come to Missouri to investigate and gather evidence no matter where a trial were to take place. With the help of modern technology and transportation, Industrivarden easily will be able to collect any relevant documents that are in Sweden and transport them to the United States. For these reasons, any burden Industrivarden might undertake in defending itself in Missouri will be minimal.

*Clune*, 233 F.3d at 245-56. Here too, the majority of the evidence will be found in Missouri or the surrounding areas, such as the beader machine at issue, eyewitnesses, medical records, and documents material to the incident. Technology and transportation have only advanced in the decade since *Clune* was decided. As commerce has become globalized in the twenty-first century, not only have exporters' reasonable expectations broadened, but so too has the capacity of their attorneys to work with local counsel to defend their legal rights in the markets that import their products. There is no reason to believe that it is more burdensome for Zumarrága to travel to Missouri than to Canada to litigate its indemnification and contribution dispute with Empire, especially since most of the relevant evidence will be found in Missouri. Moreover, Empire's interest in bringing Zumarrága into the Missouri case is also strong. *See Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 244-45 (2d. Cir. 1999)

12

(noting that Pennsylvania distributor would be forced to relitigate issues in a second forum if Japanese manufacturer were not brought into New York case).

Second, as in *Clune*, "Missouri has the strongest interest of any forum in adjudicating this dispute." 233 F.3d at 545. Here too, the accident that gave rise to the Plaintiffs' injury occurred in Missouri, and no other state has a more compelling connection to this case. *Id.*

Third, the Plaintiffs clearly have a strong interest in obtaining convenient and effective relief. This case is distinguishable from *Asahi*, where the plaintiff had already settled the case by the time it reached the Supreme Court. 480 U.S. at 106. "*Asahi* stands for no more than that it is unreasonable to adjudicate third-party litigation between two foreign companies in this country absent consent by the nonresident defendant." *Barone*, 25 F.3d at 614. Here, the Hoffmann Plaintiffs remain in the lawsuit, asserting claims against Zumarrága. Also unlike *Asahi*, the foreign manufacturer here did not merely produce a component part of the industrial machine that injured Plaintiff. Instead, Zumarrága produced the allegedly defective beader machine in its final form. As the Eighth Circuit noted in *Clune*, it may well be impossible for this Missouri family to travel abroad to seek compensation. 233 F.3d at 546.

Fourth, the judicial system's interest in obtaining the most efficient resolution of this matter also weighs in favor of personal jurisdiction over Zumarrága. As mentioned above, the allegedly defective machine is located in Missouri, the site of the accident. While the design and manufacturing processes took place in Spain, the evidence relating to those processes is likely to be documentary in nature. *See Kernan*, 175 F.3d at 245. The

alternative to adjudication of the entire dispute in Missouri would be the inefficient holding of separate trials. *Id.*

Fifth, as the Eighth Circuit wrote over a decade ago:

> Finally, the adjudication of this dispute in Missouri ensures the fundamental social policy of safety in goods that enter our marketplace. As commercial borders are dismantled in the increasingly global marketplace, more products are available to consumers in the United States. It is essential that our laws designed to protect the health and safety of human beings not be lost in this flurry of commerce.

*Clune*, 233 F.3d at 546.

For the reasons stated above, the Court finds that it has personal jurisdiction over Zumarrága. Therefore, the Motion to Dismiss must be denied.

### III. Conclusion

Accordingly, it is hereby ORDERED that the Motion for Leave to File First Amended Complaint [Doc. # 36] is GRANTED and the Motion to Dismiss for Lack of Personal Jurisdiction [Doc. # 18] is DENIED.

                                          s/ Nanette K. Laughrey
                                          NANETTE K. LAUGHREY
                                          United States District Judge

Dated: May 9, 2011
Jefferson City, Missouri